Gloria PALMER, Relator,

v.

**INDEPENDENT SCHOOL DISTRICT NO. 917, Respondent.**

No. C9–95–2219.

Court of Appeals of Minnesota.

May 14, 1996.

Review Denied July 10, 1996.

Roger A. Peterson, Scott A. Higbee, Peterson, Engberg & Peterson, Minneapolis, for Relator.

Patrick J. Flynn, Marie C. Skinner, Knutson, Flynn, Deans & Olsen, St. Paul, for Respondent.

Considered and decided by TOUSSAINT, C.J., and DAVIES and FOLEY, JJ.

## OPINION

DANIEL F. FOLEY, Judge.*

Relator incurred a traumatic brain injury in 1990 while working as a special education teacher for respondent school district. Relator returned to work part time and eventually was paid full time during the 1994–95 school year for a schedule containing reduced classroom hours to accommodate her medical needs. Relator now brings this certiorari appeal to challenge the school district's decision to place her on partial medical leave for the 1995–96 school year after the district received a report from relator's doctor that relator's disability was permanent, requiring permanent restrictions regarding classroom work hours. She contends that the school district violated the teacher tenure act and denied her due process when it placed her on medical leave without a hearing and before a second doctor examined her. We affirm.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

Relator Gloria Palmer has been employed as a special education teacher with respondent Intermediate School District No. 917 (school district) since 1977. During her career with the school district, relator has been assigned to various locations and special education programs.

On January 8, 1990, a student at Thompson Heights School pushed relator, causing her to fall and strike her head. Relator suffered a traumatic brain injury. She has undergone medical and psychiatric treatment, occupational therapy, and psychological consultation to assist her rehabilitation.

In February 1990, relator returned to her prior assignment at Thompson Heights, working four hours per day and receiving half-time pay. In approximately February 1991, the school district changed relator's site to Dakota County Technical College. Relator continued to work in the morning and was paid on a part-time basis consistent with this assignment. During the 1992–93 school year, relator worked six hours per day and was paid for six hours at a .75 Full–Time Equivalency (FTE).

At the start of the 1993–94 school year, relator was assigned to a full-time special education teaching position at Eagan High School in the IDEA Program. Her work hours were 6:45 a.m. to 2:45 p.m. In February 1994, relator complained of severe headaches and dizziness; she was unable to work. She returned to work in March at full-time pay, but under a modified schedule recommended by her doctor. Her supervisor described the modified schedule:

[I]t is recommended that [relator] resume work on an eight hour per day schedule with assists for her disability. * * * This eight hours would include preparation time, child study time, parent contact time and other things that many must choose to do at home beyond their eight hours of work. It is Dr. Lund's concern that this is not something [relator] can do. His recommendation is that she work 4.5 hours at Eagan, take a lunch and spend three hours each day on paperwork and other duties either at Eagan or at home. Workman's comp has purchased her a computer that

she has become proficient on in child study areas and student records. This would mean we would pay her as fulltime employee and hire a substitute for five hours per day. [Relator] would be in charge of developing behavior plans for the students, IEP's and deciding what is to be taught in the morning and afternoon. The substitute would be responsible for the student plans and prepping for the classes after [relator] leaves. They will team teach a math class in the morning. She will need to work daily with the substitute to insure that the behavioral plans and classes are carried out.

Relator's doctor, Dr. David Lund of Sister Kinney Institute, later informed relator's supervisor that relator should remain on the modified schedule for the 1994–95 school year. In a memorandum to the Director of Special Education dated August 16, 1994, relator's supervisor stated that Dr. Lund did not believe relator's neurological difficulties would tolerate a change in her schedule "at this time," but that the schedule could be evaluated mid-year. Accordingly, the school district hired relator full time for the 1994–95 school year with a schedule that included 4.5 to 5.0 hours of direct student contact time, a period of time at home for rest, and then 2.5 to 3.5 hours of "[c]ase management and other duties for IDEA," including attending meetings and performing paperwork. The district hired another teacher to work from 10:45 a.m. to 2:45 p.m. each day to cover the student time when relator would not be at the school.

In a memorandum to the school superintendent, relator's supervisor explained that the schedule accommodation for relator provided continuity of the special education program. He stated that any change would be detrimental to the students and the program. He recommended that the program be evaluated in January 1995 and that plans then be made to decide what relator's assignment would be for the 1995–96 school year "so that she can have proper notice of what will be expected of her for that school year * * *."

On March 24, 1995, the school superintendent wrote to Dr. Lund for an assessment of

relator's condition. Specifically, the superintendent asked Dr. Lund for an explanation of relator's medical problems, a description of her current medical restrictions for work, her short- and long-term prognoses for improvement, and when relator would be able to resume full-time work. The superintendent specifically asked if relator, beginning September 1995, could work 6.5 hours, 8:00 a.m. to 2:30 p.m., with a 30–minute duty-free lunch each day, stating that relator could complete the remaining 1.5 hours of her work day at home. The superintendent sent a similar letter to relator in June 1995.

In a letter to the superintendent dated June 30, 1995, Dr. Lund stated that relator needed the following "permanent" restrictions to her employment with the school district:

1. She work 6:45 AM–11:15 AM on site performing case manager duties and teaching her students.
2. 1/2 hour duty free lunch.
3. 3 hrs of extra work either at meetings or related school work (i.e. paperwork) either at her home or her office, depending on her level of fatigue.
4. Rick Green will not be her supervisor.
5. There needs to be a mutually agreed upon supervisor/consultant to be available to process any difficulties encountered on her job.
6. There needs to be a crisis intervention plan at Lakeville in place prior to the 1995–96 school year.

In a letter dated August 1, 1995, the school district's director of Special Education offered relator a contract with scheduled work for .75 FTE and placement on medical leave for the remaining .25 of a full-time position. Under the proposed contract, relator was required to begin work at 7:30 a.m. and end at 1:30 p.m. each day, with student contact time from 7:55 a.m. to 12:00. This included one hour of prep time and one-half hour of duty-free lunch. As an accommodation, the school district offered that relator could do the prep time later in the day. She could aggregate and schedule the weekly five hours prep time at her convenience, but relator would be required to complete it on-site and by 3:30 p.m., the end of the normal duty day.

By letter dated August 4, 1995, a representative from the Minnesota Federation of Teachers informed the school district that relator would not accept the contract, which the representative characterized as a reduction from a full-time position to one of .75 of full time. The representative advised the district that the Federation had referred the issue to legal counsel, because it viewed the district's action as a violation of the full-time schedule that the district had established with relator as an accommodation in March 1994 and had continued during the 1994–95 school year. The Federation claimed that the action violated Minn.Stat. § 125.12 (1994), Minn.Stat. ch. 176 (1994), and the American's With Disabilities Act of 1990.

By letter dated August 14, 1995, the school district requested relator to consent to examination by another physician, pursuant to Minn.Stat. § 125.12, subd. 7. On August 22, relator signed a consent to the examination. On August 24, 1995, the school board passed a resolution authorizing a medical examination by a neurologist relator selected from three neurologists the district had selected. Noting that it had before it a letter from relator's psychologist requiring restrictions in respect to relator's full-time duties as a special education teacher, the school board approved her assignment to a .75 FTE position as scheduled in the August 1, 1995, letter to her. The school board placed her on medical leave for the remaining .25 FTE, pending completion of the medical examination report and a review thereof.

On September 11, 1995, Dr. Paul Schanfield, a neurologist, examined relator. In a report dated the same day, Dr. Schanfield noted that relator suffers from exhaustion, anxiety, being upset, dizzy spells, sleep problems, and depression.[1] He concluded that relator likely suffers from "post concussive syndrome." Dr. Schanfield stated that he assumed the limitations and restrictions were

1. Dr. Schanfield's report was not before the school board when it issued the decision that is the subject of this certiorari appeal. According-ly, we have not relied on this report in reviewing the school board's earlier decision to place relator on partial medical leave.

permanent because of the length of time since the injury. He concluded that he had no reason to believe that the limitations requiring the opportunity for a mid-day rest are temporary, but, instead, assumed they are permanent.

On October 17, 1995, relator petitioned for writ of certiorari to review the school district's decision to place her on partial medical leave. After questioning jurisdiction and requesting and receiving informal briefs on the issue, this court concluded that it had jurisdiction to hear the appeal.

## ISSUES

I. Did the school district improperly place relator on partial medical leave without providing her a hearing?

II. Where relator provided a medical report from her doctor containing permanent restrictions related to her disability, did the school district violate Minn.Stat. § 125.12, subd. 7, when it placed relator on partial medical leave prior to obtaining a medical report from a second doctor?

## ANALYSIS

■ When, as here, a school board makes a decision that is within its statutory jurisdiction, this court will reverse that decision only if it is "fraudulent, arbitrary, unreasonable, unsupported by substantial evidence, not within its jurisdiction, or based on an error of law." [2] *Dokmo v. Independent Sch. Dist. No. 11,* 459 N.W.2d 671, 675 (Minn.1990).

### Right to a Hearing

■ Relator contends that the Teacher Tenure Act and/or principles of due process require that the school district provide her with a statutory hearing before placing her on partial medical leave. She first claims that the school district's reduction of her schedule to .75 FTE resulted in a leave of

absence based upon a "discontinuance of position," thus requiring notice and a hearing under the collective bargaining agreement and Minn.Stat. § 125.12, subd. 9 (1994). We disagree.

Subdivision 9 expressly provides hearing procedures for hearings held pursuant to Minn.Stat. § 125.12, subds. 6, 8 or 6b. Minn. Stat. § 125.12, subd. 9. Subdivisions 6 and 8 do not apply here.[3] Subdivision 6b involves an unrequested leave of absence caused by a "discontinuance of position, lack of pupils, financial limitations, or merger of classes * * *." *Id.,* subd. 6b. A school district and the teachers' union may negotiate a contractual unrequested leave of absence provision in place of subdivision 6b. *Id.,* subd. 6a. The union contract here contains such a plan, providing for "unrequested leave of absence, without pay or fringe benefits" made "necessary because of discontinuance of position, lack of pupils, financial limitations, or merger of classes." Agreement between Intermediate Sch. Dist. No. 917/ Dakota County Technical College and Dakota County Fed'n of Teachers Local 3904, art. X, § 4, subd. 1 (effective July 1, 1993 through June 30, 1995) (agreement). That agreement provides that teachers placed on unrequested leave "shall receive notice by June 1 of the school year prior to the commencement of such leave" and shall have a hearing as set forth in Minn.Stat. § 125.12, subd. 9. Agreement, art. X, § 4, subd. 4.

Relator believes she is entitled to an accommodated schedule, similar to the prior year's schedule, containing less than full-time classroom duty, with the remainder of her work hours made up of paperwork and meetings scheduled at a location and time to suit her needs. She contends that the change from the prior year's accommodated schedule constitutes a "discontinuance of position." But relator is a special education teacher, a position defined in the collective bargaining

**2.** The issues before us on this certiorari appeal concern application of section 125.12 of the Teacher Tenure Act and principles of due process. Not before us are other claims relator may have concerning the school district's action relevant to her disability.

**3.** Subdivision 8 concerns immediate discharge of a continuing-contract teacher. Minn.Stat. § 125.12, subd. 8. Thus, subdivision 8 does not apply here, because the school board did not discharge relator, but instead placed her on partial medical leave. Similarly, subdivision 6 does not apply here because it involves termination of a teacher at the close of the school year.

agreement. That agreement allows the school district to schedule a special education teacher for up to six hours of student contact time. Agreement, art. VI, § 1, subd. 3. Relator admits that, for medical reasons, she is now permanently restricted to a schedule of not more than 4.5 hours of student contact time. That being the case, the school district decided to place relator on medical leave pursuant to Minn.Stat. § 125.12, subd. 7. The school district's action does not constitute a "discontinuance of position" as defined in the collective bargaining agreement and Minn. Stat. § 125.12, subds. 6a, 6b.

■ Relator next claims she has a constitutional right to a hearing because a .25 reduction in her compensation pursuant to a medical leave of absence is a significant deprivation of her right to full-time pay as a tenured teacher. To support this claim, relator cites cases regarding civil servant discharge and student suspension. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 535, 105 S.Ct. 1487, 1489–90, 84 L.Ed.2d 494 (1985) (involving discharge of civil servants who, by state law, could be terminated from employment only for cause); *Goss v. Lopez*, 419 U.S. 565, 567, 95 S.Ct. 729, 731, 42 L.Ed.2d 725 (1975) (involving right to hearing of students who had received 10–day suspensions). But the school board's action here—placement of relator on temporary medical leave—is not a discharge, suspension, or similar deprivation of property interest.

The supreme court has recognized that the legislature provided in Minn.Stat. § 125.12, subds. 7 and 8, safeguards "to prevent a school board from discharging a teacher solely on the ground of serious mental or physical disability until a period of 12 months elapsed." *Obermeyer v. Independent Sch. Dist. No. 282*, 311 Minn. 232, 235, 247 N.W.2d 919, 920 (1976). These safeguards do not provide for an administrative hearing when a teacher is first placed on medical leave. Minn.Stat. § 125.12, subd. 7.

The school board's action did not permanently deprive relator of .25 of full-time pay. A teacher placed on medical leave may seek treatment or medical care and be reinstated if he or she recovers sufficiently within 12 months. *Id.* Further, the school district must pay relator sick leave benefits for her medical leave of absence up to the amount of her unused accumulated sick leave. *Id.* The statute provides an opportunity for treatment and/or, as in the instant case, an opportunity for the teacher to work to his or her capacity without being subjected to immediate discharge when he or she cannot perform the job. *Id.* In addition, the statute also provides the teacher an opportunity to challenge the imposition of medical leave of absence and then to be examined by a physician at the expense of the school district before the district may continue him or her on medical leave. *Id.* A teacher placed on medical leave under subdivision 7 has a right to a hearing in the event that she or he does not recover and the school district seeks to discharge him or her "subsequent to a 12 month leave of absence and inability to qualify for reinstatement in accordance with subdivision 7." Minn.Stat. § 125.12, subd. 8(f). Finally, where a decision to place a teacher on medical leave is final, as it is here because relator's assignment will remain in effect absent changed circumstances, the teacher has a right to petition the court of appeals immediately for certiorari review of the school district's action. *See Brandhorst v. Special Sch. Dist. No. 1*, 392 N.W.2d 888, 888–89 (Minn.1986) (school district's decision to place teacher on unrequested leave of absence is reviewable by certiorari). These safeguards supply sufficient procedural due process to a teacher when first placed on medical leave without a subdivision 9 administrative hearing.

We also note that the supreme court has declined to find that a right to a hearing exists under section 125.12, where the statute has not expressly granted one. *See, e.g., Pearson v. Independent Sch. Dist. No. 716*, 290 Minn. 400, 404, 188 N.W.2d 776, 779 (1971). In *Pearson*, the supreme court enumerated the circumstances under which the statute expressly provided for a hearing. *Id.* at 403, 188 N.W.2d at 778. It noted that the statute did not expressly provide for a hearing regarding the renewal of a probationary teacher's contract. *Id.* at 402, 188 N.W.2d at 778. The court held that no hearing was

required before a school board may decide not to renew a probationary teacher's contract. *Id.* at 404, 188 N.W.2d at 779. Similarly, section 125.12 does not expressly provide for an administrative hearing when a school board first places a teacher on medical leave. At that initial stage, the statute contains procedures whereby the teacher may challenge an unrequested medical leave, but it does not contain provisions for a hearing. Minn.Stat. § 125.12, subd. 7.

We hold that the hearing procedures of subdivision 9 do not apply where a teacher is placed on medical leave. Placement of a teacher on medical leave does not require a hearing to comply with either the teacher tenure act or with fundamental principles of due process.

### Medical Examination Requirements

█ Relator contends that the school board's action is invalid because it did not properly follow procedures in Minn.Stat. § 125.12, subd. 7, when it placed her on partial medical leave. That statute provides, in part:

> Affliction with active tuberculosis or other communicable disease, mental illness, drug or alcohol addiction, or other serious incapacity shall be grounds for temporary suspension and leave of absence while the teacher is suffering from such disability. Unless the teacher consents, such action shall be taken only upon evidence that suspension is required from a physician who has examined the teacher. The physician shall be competent in the field involved and shall be selected by the teacher from a list of three provided by the school board, and the examination shall be at the expense of the school district.

*Id.* The school board provided relator with a list of three physicians after its formal decision to place her on medical leave. The examination occurred almost three weeks after the school board had placed relator on partial medical leave.

The school district argues that it was not required to follow the statutory procedure for medical examination prior to medical leave, because relator consented to work less than a full-duty day. *See id.* (school board need not follow statutory procedure for medical examination if teacher consents to being placed on medical leave). Relator contends, however, that her prior agreement to accommodated "full-time" work with less than full-time student contact did not constitute a consent to partial medical leave. Further, she claims that any consent on her part was nullified when her collective bargaining representative notified the district's superintendent that relator would not accept a .25 reduction in her position. We disagree.

Again, relator bases her argument on an erroneous belief that she has a legal right to dictate her schedule from year to year. Rather, the union contract provides that the work week for a full-time special education teacher "shall be forty (40) hours" and that the "regular duty day shall consist of not more than six (6) hours of student contact time * * *." Agreement, art. VI, § 1, subd. 3. The record indicates that the school district sought to schedule relator for 6 hours of daily student contact time beginning September 1995.[4] As the district notes, relator does not contest the fact that her disability restricts her to student contact time under 4 to 4.5 hours per day. The school district has been generous in paying relator full time for less than full-time classroom duties while she was recuperating from her injuries. It apparently did so because it had reason to believe that relator would return to full-time duties. But in June 1995, the school district learned that relator's inability to work full time in the classroom is *permanent.*

The school district decided to schedule relator for a full complement of student contact, rather than the reduced class schedule contained in relator's previous contracts. She asserted medical disability in rejecting that schedule. When the school board decided to place relator on partial medical leave, it had before it a letter from relator's doctor requiring that, because of medical reasons,

---

4. The superintendent sent relator a letter asking her to provide a doctor's statement whether she could work 6-1/2 hours daily, 8:00 a.m. to 2:30 p.m., with a 30 minute duty-free lunch. The superintendent stated that relator would be allowed to complete the remaining 1-1/2 hours of her work day at home.

relator's work schedule must be restricted to classroom hours that are less than the hours of a regular full-time special education teacher as set forth in the collective bargaining agreement. The record shows that relator authorized her doctor to provide this and other reports to the school district. She does not contest the content of those medical reports. Under these circumstances, the school board reasonably concluded that relator agreed to the fact that she was not capable of working full time, thus, in effect, consenting to be placed on medical leave.[5]

The school district did not violate Minn. Stat. § 125.12, subd. 7, when it placed relator on partial medical leave prior to examination by a second doctor according to the procedure in that statute.[6]

## DECISION

Placement of relator on medical leave is neither a discharge nor a demotion and does not require a hearing under either the Teachers Tenure Act or principles of due process. The school district did not violate the law, nor did it act arbitrarily or unreasonably, when it placed relator on partial medical leave after receiving a report from relator's doctor indicating that relator is permanently disabled and is restricted to a work schedule of less than the maximum allowable student contact time for relator's position, as defined in the collective bargaining agreement.

**Affirmed.**

5. We note that, at the time relator applied for certiorari review, the school board was in full compliance with Minn.Stat. § 125.12, subd. 7, even if no consent occurred here. Relator had chosen Dr. Schanfield from a list of three doctors provided by the district. *Id.* Dr. Schanfield examined relator and issued a report less than three weeks after the school board placed relator on partial medical leave. Dr. Schanfield concluded that relator was permanently disabled, restricting her to less than full-time student contact. Relator has indicated that this evaluation is correct. Although we do not rely on Dr. Schanfield's report to support the school district's initial decision, we note that his conclusions, and relator's agreement with them, would make remand to comply with the statutory procedure a pointless exercise.

6. In her reply brief, relator raises a claim that she had a right to an examination by a three-doctor panel under Minn.Stat. § 125.12, subd. 7. Relator has violated the Rules of Civil Appellate Procedure by raising this issue for the first time in her reply brief. *See* Minn. R. Civ.App. P. 128.02, subd. 3 ("reply brief must be confined to new matter raised in the brief of respondent"); *Reserve Life Ins. Co. v. Commissioner of Commerce,* 402 N.W.2d 631, 634 (Minn.App.1987) (striking issues raised for first time in reply brief), *review denied* (Minn. May 20, 1987). Further, the examination by a panel of three doctors is confined to circumstances where a teacher submits to an examination regarding a mental illness and the teacher or the school board decides that the examining physician's or psychiatrist's statement is unacceptable. Minn.Stat. § 125.12, subd. 7. Even assuming relator suffers from mental illness, neither the school district nor relator challenges the validity of either Dr. Lund's or Dr. Schanfield's conclusion that relator has a disability that requires certain work restrictions. These circumstances do not require further examination by a panel of experts.